MORGENSTERN CHEMICAL COMPANY Inc., Plaintiff,

v.

G. D. SEARLE & COMPANY, Defendant.

Civ. A. No. 263-56.

United States District Court
D. New Jersey.
April 3, 1957.

Chazin & Chazin, Jersey City, N. J., by Copal Mintz, New York City, for plaintiff.

Shanley & Fisher, by Frederick B. Lacey, Donald A. Robinson, Newark, N. J., and Howard P. Robinson, Chicago, Ill., for defendant.

WORTENDYKE, District Judge.

There is diversity of citizenship between the parties to this action and the minimum jurisdictional requirement exists. The Court has jurisdiction of the parties.

The plaintiff, a corporation of the State of New York, is seeking an injunction, together with an accounting of profits and counsel fee, to restrain further use by the defendant, a corporation of the State of Illinois, of the name Mictine, which the defendant has adopted for one of its products. Plaintiff alleges such a similarity in spelling, sound and suggestiveness to the name Micturin, which the plaintiff had previously adopted for one of its products, as to render likely confusion of the products of the respective parties in the minds of purchasers thereof. The action is not for infringement of a registered trade mark or trade name under the Lanham Act, 15 U.S.C.A. § 1051 et seq. Plaintiff claims to have coined and thereby to have acquired a property

right in the name which it adopted for its product, and charges unfair competition or unfair trade practice on the part of the defendant in adopting a name for its product of such similarity as to be confusing to those persons, specifically physicians and pharmacists, having occasion to prescribe and dispense the pharmaceutical products of the respective parties designated by the allegedly similar names. A brief review of the evidence will point up the questions, the resolution of which the Court is called upon to make.

The plaintiff was incorporated in November 1939, and Alexander V. Morgenstern has been continuously its president and in general managerial control of its business throughout its existence, except for a period between 1948 and 1950 when he retired from that office. During this interim Mr. Morgenstern remained as consultant while the business was being conducted by his two sons. The sole place of business of the plaintiff is located in Mt. Vernon, New York, to which it moved from New York City in July, 1953. Plaintiff corporation acquired from Morgenstern the right to use the business name of Physicians Drug Company, under which the plaintiff marketed its products, including that involved in this litigation.

During late 1949 or early 1950, while Mr. Morgenstern's two sons were operating plaintiff's business, the father devised a formula for a urinary tract antiseptic embodied in the form of enteric tablets, to be taken by mouth. For these tablets he conceived and adopted the name "Micturin" which he felt to be suggestive of miction (urination) and micturition (the passage of urine) ; each of which is derived from the Latin *micturire*, meaning to urinate.

The plaintiff undertook the promotion and marketing of these urinary antiseptic tablets under the name which had been conceived by Mr. Morgenstern. The latter composed the labelling and promotional literature, cleared the product with the United States Food and Drug Administration, and planned and directed, in behalf of the plaintiff, the promotional and marketing procedures. These procedures began with a circular letter, dated March 22, 1950, addressed to 102 wholesale druggists located in various places throughout the United States, which was followed by unsolicited shipments, on consignment, of a dozen or two of boxes of the product, invoiced to each of the consignees. Another promotional procedure pursued by Mr. Morgenstern involved the use of so-called "return" post cards bearing the names of some of the plaintiff's products, with places on the "return" card, opposite the name of each product, for the insertion of a check or cross mark to indicate the interest of the addressee in the particular product. These cards were mailed to some 102,000 physicians in various localities in the United States. Two samples of this tablet, enclosed in an envelope bearing printed information about the product, together with a card bearing advertising text relative thereto, all composed by Mr. Morgenstern, were mailed to those physicians who indicated an interest in the product by use of this return post card.

Commencing with the year 1951 plaintiff caused its product to be listed, under the name "Micturin", in the Blue Book and in the Red Book, both annual catalogues of proprietary pharmaceuticals widely circulated among the drug trade.

Plaintiff's product was sold in lots of 50 tablets, each lot packaged in a square cardboard box bearing a label reading as follows: "50 Micturin Tablets—Each Tablet Contains: Methenamine—3-$\frac{1}{2}$ gr. Aminophyllin—$\frac{1}{2}$ gr. Hyoscyamin alk.— $\frac{1}{400}$ gr. Caution: To be dispensed only by or on the prescription of a physician, according to directions. Literature available to physicians on request. If the urine is alkaline, an 'acidifier' (sodium or ammonium biphosphate) should be taken. Distributed by Physicians Drug Company, New York 14, New York." These boxes were advertised for sale at the retail price of $2 per box, or $16 for a dozen boxes.

The Micturin tablets, circular in shape, pink in color, and glossy surfaced, were actually manufactured for the plaintiff

by Strong Cobb Company, Inc., of Cleveland, Ohio, and later by The Arner Co., Inc., of Buffalo, New York, in accordance with Mr. Morgenstern's formula. The plaintiff boxed and labelled the tablets and distributed them under the name of Physicians Drug Company. There appears on the tablet no name, mark or symbol to indicate its source or proprietorship.

Plaintiff's advertising material relates that the tablets are indicated for disinfection of the urinary tract, control of inflammation and pain, evacuation of stagnant urine and relaxation of sphincter spasm in genito-urinary cases involving micturition trouble (nephritis, pyelitis, urethritis, cystitis and prostatitis). The same cards point out that, by means of the enteric coating, the tablets are protected from attack by gastric hydrochloric acid so as to permit development of full therapeutic activity in the urinary organs. The distributor suggests that Micturin tablets are preferable to the toxic antiseptics (which may exert undesirable side-effects) for prolonged administration in "catarrhs" of the bladder and urethra in both sexes. The advertising further claims that these tablets are valuable "in mild infectious processes common in elderly persons, and for prophylaxis when catheterization is required."

Although Mr. Morgenstern testified that plaintiff was supplied with 213,900 tablets by the Strong Cobb Company and 209,500 tablets by The Arner Company,— these two quantities constituting all of the tablets produced for the plaintiff,— the witness tells us that no record was kept of how many tablets were actually sold. He explains that many of plaintiff's sales records have been lost or destroyed. He recalls that when each shipment was made the invoice was entered in the sales ledger, duly posted, and on receipt of payment the amount due was credited, whereupon the retained copies of the invoices were destroyed. "Copies of some of these orders, however, which had been retained, were marked in evidence, but are not reliable indications of the aggre-

gate total or frequency of sales, because incomplete. However, for the years 1955 and 1956 plaintiff produced all of its invoices, which were marked in evidence, showing total sales of $83.92 and $58.37 for each of those years respectively. Conceding that his estimates for the years preceding 1955 were mere guesses, Mr. Morgenstern testified that for the year 1950 plaintiff's gross sales ranged between $2,000. and $2,500.; for 1951 between $2,000. and $3,000.; for 1952, $3,000; for 1953 between $2,000. and $2,500.; for 1954 between $1,800. and $2,000. He admitted" that plaintiff abandoned promotion of the sale of Micturin tablets in March or April 1953, with the intention of waiting until the medical profession might indicate a trend of aversion from the use of antibiotics and sulphanimides which are presently completely monopolizing the field in which he claimed Micturin was indicated. In this immediate connection, plaintiff produced no evidence tending to induce the expectation that the use of these popularly called "wonder drugs" was likely to diminish in the foreseeable future. On the other hand, competent medical testimony adduced by the defendant satisfies me that the use of these now universally recognized therapeutic agents is progressively expanding rather than diminishing.

The defendant is a large manufacturer of ethical pharmaceutical specialties, employing some 900 persons, one-third of whom are engaged in research. Its products are sold in 50 or 60 countries of the world. Its main plant is in Chicago, Illinois, and it operates other plants in Lyndhurst, New Jersey, San Francisco, California, Toronto, Canada and London, England. It sells only to wholesale druggists, but its promotion is through the medical profession as well. None of its advertising is directed to laymen.

Through its research activities the defendant originated and developed a brand of amino-metramide. For this product defendant sought an appropriate name and invited suggestions from certain of its employees for that purpose. From

the suggestions so offered, the name *Mictine* was adopted, but only after the following events had transpired.

"Defendant first thought of the name Mictine the latter part of June or July, 1954. At that time, it consulted various publications and a card index to determine the availability and registerability of the name as a trademark. Among such publications was the Red Book above referred to. Defendant noted therein the listing of Micturin as a product of or distributed by Physicians Drug Company. Thus, or through supplementary investigation, defendant became aware that plaintiff produced and marketed a product known as Micturin Tablets for a urinary antiseptic in August, 1954."

In September 1954 the name was filed with the Combined Trade Mark Bureau, a trade organization to which the defendant belonged, for the purpose of evoking any objections to the use of the name which might emanate from any of the members of the Bureau. With no such objections forthcoming, the name *Mictin* was thereupon submitted to defendant's attorneys, for the purpose of making a trade-mark search report based on the United States Patent Office records, and other sources. The report, dated October 22, 1954, showed the existence of a product of Physicians Drug Co. of Mt. Vernon, New York, known as " 'Micturin' Tablets." After receipt of this report, defendant's vice-president, Mr. O'Brien, contacted Mr. Alexander V. Morgenstern, in November 1954, by telephone, advising the latter that the defendant had determined to adopt the name "Mictin" for its product and inquiring, as a matter of courtesy, whether Mr. Morgenstern had any objection to the use of such a name for defendant's diuretic product. Mr. Morgenstern advised Mr. O'Brien that he would object to the use of the name "Mictin", but offered to sell to defendant all of plaintiff's rights in the name "Micturin", as well as plaintiff's business; stating at the time that the plaintiff's product was not of importance and was only yielding a profit of approximately $2,000 per annum. Mr. O'Brien indicated that defend-

ant would not be interested in such a purchase, but both individuals left open the possibility of further discussions of this subject. The telephone conversation between Mr. O'Brien and Mr. Morgenstern was succeeded by correspondence between them and others, in the course of which references were made to the similarity between the names Micturin and Mictin, and the possibility of confusion of the two. In this correspondence there is a current of negotiation, kept alive principally by Mr. Morgenstern, looking to the ultimate possibility of the sale of his product and right to the use of the name Micturin to the defendant. The evidence further discloses that Mr. O'Brien had indicated to Mr. Morgenstern that the defendant would make a change in the contemplated name of "Mictin", but the testimony is uncontradicted that the name "Mictine" was ultimately adopted by the defendant, and used upon the labels of the containers of its product, commencing on or about December 1, 1954.

Defendant's tablet is also circular, or disc-like in shape, although its contour differs from that of the product of the plaintiff. The color of defendant's tablets is a deep rose shade, the surface of the tablet is dull rather than glossy (as in the case of plaintiff's tablet), and every tablet of the defendant bears impressed thereon the name "Searle." Defendant's tablets are packaged in square glass bottles and marketed in quantities of 100 and 1,000. The label on each bottle reads as follows: "Searle-Mictine-Brand of aminometradine (1-allyl-3-ethyl-6-aminotetrahydropyrimidinedione) 200 mg. Caution: Federal law prohibits dispensing without prescription. Usual adult dose: three tablets daily with meals, on alternate days; or as recommended in Reference Manual No. 51, available to physicians on request. G. D. Searle & Co. Chicago."

A pamphlet entitled "Research in the Service of Medicine", Volume 40, published by defendant in 1955, recommended the use of Mictine for diuretic therapy in cases of hypertension, congestive

heart failure, glomerulo-nephritis, pylonephritis and nephrosis. Volume 43 of the same publication recommended Mictine for the relief of edema and as a diuretic therapeutic in cardiac failure. Oral testimony amply confirmed the fact that defendant's product is classified as a non-mercurial diuretic and would be prescribed only for the relief of the above ailments.

■ On the basis of the foregoing evidence, I am impelled to certain findings of fact. The name Micturin or Micturin Tablets was lawfully conceived and adopted by the plaintiff to designate the tablets which it undertook to promote, and succeeded to a degree in selling, to some wholesale druggists in limited quantities at localities in various portions of the United States. With full knowledge of plaintiff's conception and adoption of the name Micturin, defendant adopted the name Mictine. Both Micturin and Mictine are derived from or based upon the same root and are intended to suggest urination. Although both products are sold and promoted only for dispensing by a pharmacist upon the prescription of a doctor, the similarity terminates at this point. The plaintiff's Micturin is a urinary tract antiseptic for use in certain genito-urinary cases, while defendant's Mictine is a non-mercurial diuretic for use in the relief of edema and cardiac failure. Since both products are dispensed only on prescription, I am not concerned with the likelihood of confusion in the minds of the general public, but am limited to an inquiry whether such confusion may exist within the specialized group composed of physicians and pharmacists. It appears from the combined testimony of an eminent cardiologist, two university professors of pharmacology, a general medical practitioner and a dispensing retail pharmacist, that it is extremely unlikely that a physician would prescribe or a pharmacist dispense the product of one of the parties for the treatment of a condition for which the product of the other party is indicated. The Court takes judicial notice of the high standards of care inherent in both the fields of medicine and pharmacy and finds that such standards indicate the unlikelihood of confusion of the type urged by the plaintiff.

■■ The name "Micturin" or "Micturin Tablets," though not a registered trade-mark or trade name, is a valid common-law trade name. Plaintiff is the owner of the name and is therefore entitled to the law's protection of its drawing power as a congenial symbol for its product. "A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value." Mishawaka Rubber & Woolen Manufacturing Co. v. S. S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381. The name which plaintiff has conceived and adopted for its product is, therefore, a valid common-law trade-mark or trade name in the use of which the plaintiff is entitled to be protected against confusion resulting from the use by another of the same or a similar name for a competing product in the same market. "What degree of resemblance is necessary to constitute an infringement (of a trade-mark or trade name) is incapable of exact definition, as applicable to all cases. All the courts of justice can do, in that regard, is to see that no trader can adopt a trade-mark so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution, are likely to be misled." McLean v. Fleming, 96 U.S. 245, 251, 24 L.Ed. 828. In affirming injunctive relief upon a finding of infringement of a common-law trade-mark below, the Supreme Court, in McLean, pointed out, 96 U.S. at page 251, that the ground for the relief to which the court found the plain-

tiff to be entitled was "that one man is not allowed to offer his goods for sale, representing them to be the manufacture of another trader in the same commodity."

The general principles relating to the infringement of trade names are stated in Chapter 35 of the Restatement of the Law of Torts (§§ 711, et seq.) A trade name is defined (§ 716) as "Any designation which (a) is adopted and used by a person to denominate goods which he markets * * * or a business which he conducts, * * * and (b) through its association with such goods, * * * or business, has acquired a special significance as the name thereof, and (c) the use of which for the purpose stated in clause (a) is prohibited neither by a legislative enactment nor by an otherwise defined public policy." Under "Comment" following the statement of the foregoing definition, we are told that "A designation is not a trade name until it has in fact become in the market the name for goods * * * coming from or through a particular source or the name for a particular business." The same Comment reminds us that "The phrase 'secondary meaning' (which is the connotation of the phrase 'special significance' as thus used), does not mean a subordinate or rare significance. It means rather a subsequent significance added to the previous meaning of the designation and becoming in the market its usual and primary significance." Whether there has been an acquisition of such special significance is a question of fact in each case, no particular period of use being required. "The issue in each case is whether or not in fact a substantial number of present or prospective purchasers understand the designation, when used in connection with goods, * * * as referring to a particular person * * *."

In the case at bar the plaintiff relies upon the obvious similarity in derivation, suggestiveness, spelling, and sound in careless pronounciation, between "Micturin" and "Mictine" as applied to pills to be taken by mouth for therapeutic purposes. If each of the names was employed to designate a medicinal tablet designed for the alleviation or cure of the same or closely related human ailments, this Court would have no difficulty in finding a confusing similarity between the two names, as was claimed in G. D. Searle & Co. v. Chas. Pfizer & Co., Inc., 7 Cir., 1956, 231 F.2d 316. Medicinal pills are not prescribed, dispensed or taken indiscriminately. A purchaser desiring a laxative tablet would not be induced by any similarity between names to purchase a sleeping pill. Neither from the evidence presented in this case, nor by way of judicial notice, can this Court reasonably find that a physician would prescribe or a pharmacist dispense the product of one of the parties for the treatment of a condition for which the product of the other party is indicated. Similarity in sound or appearance of a word employed to designate a product for the market is not "confusing," as the term is contemplated by the apposite decisions, unless each of the names is applied to a similar product and is likely to induce a purchaser to ask for one of the products when seeking to obtain the other. Hyde Park Clothes v. Hyde Park Fashions, 2 Cir., 1953, 204 F.2d 223, certiorari denied 346 U.S. 827, 74 S.Ct. 46, 98 L.Ed. 351. Since I am unable to find a confusing similarity in connotation between the names in question as applied to the products respectively indicated thereby, I am unable to conclude that defendant has infringed upon the rights of plaintiff in its common-law trade name.

Since this case does not arise under the Lanham Act, 15 U.S.C.A. § 1051 et seq., but seeks protection for a common-law trade name, it is to be governed by the law of the forum. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188; Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S. Ct. 109, 83 L.Ed. 73. "Unless there is * * * actual competition, there cannot be unfair competition." Goldscheider v. Schnitzer, Ch.Div.1949, 3 N.J.Super. 425, 429, 66 A.2d 457, 459, citing National Grocery Co. v. National Stores Corp., 95 N.J.Eq. 588, 123 A. 740, affirmed 97 N.J.

Eq. 360, 127 A. 925; and Baltimore **v.** Clark, 131 N.J.Eq. 290, 24 A.2d 30, affirmed 132 N.J.Eq. 374, 28 A.2d 169. I find no actual competition between Micturin tablets and Mictine. Therefore, there can be no unfair competition in the use of Mictine to designate defendant's non-competing product. Paraphrasing the language of the opinion in Cridlebaugh v. Rudolph, 3 Cir., 1942, 131 F.2d 795, at page 801, certiorari denied 318 U.S. 779, 63 S.Ct. 855, 87 L.Ed. 1147,— Even if Micturin were a valid trademark, the right of the plaintiff would extend no further than the protection against the unfair use of a similar trademark by a competitor who seeks thereby to palm off his goods as those of the plaintiff. I can find in the evidence in this case no basis for inferring that there is any likelihood that prospective purchasers of Micturin tablets will be misled into purchasing defendant's product by reason of the latter's use of the name Mictine.

While plaintiff may be entitled to the exclusive use of the name Micturin for urinary antiseptic tablets, defendant's use of Mictine for oral non-mercurial diuretic tablets is not a misappropriation of plaintiff's rights, whatever the similarity in sound and derivation of the two names. The conclusion to which I am impelled is uninfluenced by any disparity between the respective yields from the sales of plaintiff's product and that of the defendant.

Plaintiff argues that the absence of any evidence of "palming off" by the defendant of its product as that of the plaintiff is immaterial. With this I do not agree. Warner & Co. v. Eli Lilly & Co., 1924, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161. It is at least material to the issue of whether the defendant is guilty of unfair competition with the plaintiff, and I conclude as a matter of law that it is an element which must be considered in determining whether or not the defendant is guilty of any infringement of plaintiff's rights in its trade name. Obviously if there is no infringement and no unfair competition, the plaintiff is not entitled to an accounting by the defendant of its profits from the sale of Mictine. Q-Tips, Inc., v. Johnson & Johnson, 3 Cir., 1953, 206 F.2d 144, 148, certiorari denied 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377.

Each of the parties to this action has submitted voluminous briefs and presented protracted arguments embodying the discussion of numerous decisions of State and Federal courts. None of these cases, however, is authority for the proposition, posed by the plaintiff in the case at bar, that, because of its priority of conception of the name which it has given to its tablets, it has acquired the right to prevent the subsequent use by another of a name, for its dissimilar product, sounding and appearing somewhat similar to plaintiff's name.

I find in this case that plaintiff's common-law trade name "Micturin" or "Micturin Tablets" is not infringed by the defendant's use of the trade name "Mictine," and that defendant is guilty of no unfair competition with the plaintiff by the adoption and use of the latter trade name. Accordingly, the complaint must be dismissed, with prejudice, and judgment will be entered for the defendant.

The foregoing opinion shall constitute the Court's findings of fact and conclusions of law, and an order may be presented in accordance therewith.